**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BRENDA REINERT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 09-cv-3097 |
| v. ) | |
| ) | |
| LSI CORPORATION, ) | The Honorable James Knoll Gardner |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant LSI Corporation ("LSI"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 7.1 of the Local Rules of the United States District Court for the Eastern District of Pennsylvania and the Court's October 22, 2009 Rule 16 Status Conference Order, files this Memorandum of Law in Support of its Motion for Summary Judgment.

## I.   INTRODUCTION

Plaintiff Brenda Reinert ("Reinert") initiated this action on June 10, 2009 by filing a single count Complaint alleging that LSI violated Section 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1140, when it terminated her employment in connection with the sale of LSI's Mobility Products Group ("MPG") business to Infineon Technologies AG ("Infineon"). Pursuant to the sale of the business, the employment of all MPG employees, including Reinert, ceased with LSI effective October 24, 2007, the closing date, and began with Infineon the next day, October 25, 2007. Reinert's termination date was five days prior to her 49th birthday. Because she had not reached her 49th birthday before the completion of the sale to Infineon, Reinert did not qualify for a "transition leave of absence" ("TLA") which would have permitted her to bridge her age (*i.e.*, allow her to add 1 year to her age) in order to

receive an immediate service pension under the Agere Systems Inc. Pension Plan (the "Plan") at age 50.[1]

LSI is entitled to summary judgment on Plaintiff's Section 510 claim because Reinert cannot establish that LSI terminated her employment with the specific intent to deny her greater pension benefits. Rather, the evidence clearly shows that: (a) LSI sold its MPG business and transferred all of the approximately 600 employees of the MPG business to Infineon in a non-discriminatory sale of a business; and (b) Reinert was treated the same for pension purposes and in accordance with the terms of the Plan as all of the approximately 600 other employees who were terminated from LSI and were transferred to Infineon in connection with the sale of the MPG business.

Additionally, Reinert seeks damages equal to the difference in the amount of pension benefits she would have received had she remained employed by LSI through her 49th birthday. Such damages are not permissible, because violations of Section 510 can only be remedied by equitable relief. For this additional reason, LSI is entitled to summary judgment and Reinert's Complaint should be dismissed with prejudice.

Finally, to the extent Reinert seeks to assert a claim against LSI for violation of ERISA Section 502, 29 U.S.C. § 1132, such claim must be denied by that Court. Reinert did not assert a Section 502 claim in her Complaint, never sought to amend her Complaint to add a Section 502 claim, and never exhausted her administrative remedies under the Plan. As such, she must be precluded from pursuing a Section 502 claim at the summary judgment stage of this case.

---

[1] Instead, Reinert elected to receive a lump sum payment of the present value of her pension at the time of her termination from employment with LSI. (Reinert Dep. Ex. 15). By virtue of this election, Reinert received a gross distribution under the Plan in the amount of $166,730.04, which she chose to roll over into an individual retirement account ("IRA"). (Reinert Dep. at pp. 101-102).

However, even if the Court considers Reinert's Section 502 claim, LSI is entitled to summary judgment on that claim.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  The moving party is not required to provide evidence "negating the opponent's claim," but rather need only show "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The burden then shifts to the nonmoving party to point to specific evidence – as opposed to mere allegations, general denials or vague statements – establishing a genuine issue for trial.  Celotex, 477 U.S. at 324; Blair v. Scott Specialty Gases, 283 F.3d 595, 603 (3d Cir. 2002).  If she fails to make such a showing, summary judgment must be entered against her.  Celotex, 477 U.S. at 322-23; Anderson, 477 U.S. at 249-50.

## III.   ARGUMENT

### A.   LSI Is Entitled To Summary Judgment On Reinert's ERISA § 510 Claim.

Reinert's sole claim is that LSI violated Section 510 of ERISA.  Section 510 provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C. § 301 et. seq.], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.

29 U.S.C. § 1140.  In order for Reinert to recover in a Section 510 action, she must demonstrate that LSI had the specific intent to violate ERISA.  Jakimas v. Hoffmann-La Roche, Inc., 485

3

F.3d 770, 785 (3d Cir. 2007); Fletcher v. Lucent Technologies, Inc., 207 Fed. Appx. 135, 139 (3d Cir. 2006); DiFederico v. Rolm Co., 201 F.3d 200, 204-05 (3d Cir. 2000). This means that Reinert must show that LSI "made a conscious decision to interfere with her attainment of pension eligibility or additional benefits." Jakimas, 485 F.3d at 785 (quoting DiFederico, 201 F.3d at 205). Proof that Reinert lost benefits because of her termination alone is not enough, and proof that her termination prevented her from accruing additional benefits through more service alone is not probative of intent. Jakimas, 485 F.3d at 785.

A plaintiff can use both direct and circumstantial evidence to prove that a Section 510 violation occurred. Dewitt v. Penn-Del Directory Corp., 106 F.3d 514, 523 (3d Cir. 1997). "Direct evidence in this context must demonstrate that 'decision makers placed substantial negative reliance on an illegitimate criterion in reaching their decision.'" Jakimas, 485 F.3d at 786 (quoting Anderson v. CONRAIL, 297 F.3d 242, 248 (3d Cir. 2002)). If, as in this case, a plaintiff has no direct evidence, the Court applies a burden-shifting analysis. Fletcher, 207 Fed. Appx. at 139; DiFederico, 201 F.3d at 205. The first prong of the burden-shifting analysis requires a plaintiff to show "(1) the employer committed prohibited conduct (2) that was taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." Jakimas, 485 F.3d at 785 (internal citation omitted); see also Schwartz v. Independence Blue Cross, 299 F. Supp. 2d 441, 446 (E.D. Pa. 2003) (citing Eichorn v. AT&T Corp., 248 F.3d 131, 149 (3d Cir. 2001)). If a plaintiff succeeds in making this *prima facie* showing, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its conduct. Jakimas, 485 F.3d at 785-86. Once the employer articulates such a reason, the burden shifts back to the plaintiff to show that the employer's rationale was pretextual. Id. at 786. In order to meet this burden, the plaintiff must "either directly . . . persuade the court that

4

the discriminatory reason more likely motivated the employer or indirectly persuade the court by showing that the employer's proffered explanation is unworthy of credence." Id. at 786.

### 1. Reinert has no direct evidence that LSI violated Section 510.

To establish a Section 510 violation through direct evidence, Reinert must present evidence that reveals "a sufficient discriminatory or illegal animus making it unnecessary to rely on any presumption from the *prima facie* case to shift the burden of production." Jakimas, 485 F.3d at 786 (internal citations omitted). "Only the most blatant remarks whose intent could be nothing other than to discriminate constitute direct evidence." Id. Reinert has proffered no evidence that anyone at LSI made such discriminatory remarks; therefore, she cannot prove a specific intent to violate Section 510 with direct evidence.

### 2. Reinert cannot show that LSI took specific action for the purpose of interfering with her pension benefits.

Reinert also cannot establish through circumstantial evidence a *prima facie* case under Section 510, because she cannot show that LSI took specific action for the purpose of interfering with her pension benefits. Pursuant to Section 5.4 of the Asset Purchase Agreement ("APA") between LSI and Infineon, LSI was obligated to transfer all of the approximately 600 employees of the MPG business to Infineon on the day following the date of the closing of the sale. (Bento Aff. at ¶ 9, Ex. 1, p. 44). Despite this clear obligation of LSI to transfer all MPG employees to Infineon immediately following the October 24, 2007 closing, Reinert claims that LSI should have treated her differently because she was only five days shy of qualifying for additional pension benefits. Thus, Reinert sought *special treatment* from LSI, specifically requesting that LSI effectively breach the terms of the APA in order to allow her to remain employed by LSI until her 49th birthday on October 29, 2007. (Reinert Dep. at 8, 16).

Reinert conceded that she was not aware of any MPG employee who was allowed to

5

remain employed with LSI after the closing date in order to qualify for a TLA. (Reinert Dep. at 94-95). Reinert also acknowledged that there were other MPG employees who were close to reaching their 49th birthday and qualifying for a TLA, and those employees were also transferred to Infineon upon the closing date, just like she was. (Reinert Dep. at 24, 93-94). In fact, the evidence shows that all MPG employees were terminated from LSI effective October 24, 2007 and became employees of Infineon on October 25, 2007; <u>there were no exceptions</u>. (Bento Aff. at ¶ 13).

In sum, Reinert cannot establish that LSI singled her out for the purpose of interfering with her pension benefits because she has presented no evidence of an intent to interfere. "Where the only evidence that an employer specifically intended to violate ERISA is the employee's lost opportunity to accrue additional benefits, the employee has not put forth evidence sufficient to separate that intent from the myriad of other possible reasons for which an employer might have discharged him." <u>DeWitt</u>, 106 F.3d at 523 (quoting <u>Turner v. Schering-Plough Corp.</u>, 901 F.2d 335, 347 (3d Cir. 1990)); <u>see also</u> <u>Fletcher</u>, 207 Fed. Appx. at 140. In this case, Reinert's lost opportunity to accrue additional pension benefits was merely incidental to LSI's legitimate business decision – the sale of the MPG business to Infineon. This is precisely the type of incidental loss that does not violate Section 510. <u>See</u> <u>Petrus v. Lucent Technologies, Inc.</u>, 102 Fed. Appx. 969 (6th Cir. 2004) (plaintiff's loss of pension benefits was a mere consequence of, not a motivating factor behind, company's decision to sell plaintiff's division to another company); <u>see also</u> <u>Szczesny v. Gen. Elec. Co.</u>, 66 Fed. Appx. 388, 394 (3d Cir. 2003) ("Mere proof of an incidental loss of benefits resulting from an employee's discharge from employment does not constitute a violation of Section 510.").

Here, Reinert has no evidence that LSI's decision to sell its MPG business was made with

the "specific intent" to interfere with her accumulation of additional pension benefits. LSI's decision to terminate her employment (and the employment of all MPG employees) was made in strict accordance with the APA. As such, Reinert cannot establish a *prima facie* case under Section 510, and LSI's Motion for Summary Judgment should be granted.

### 3. LSI has articulated a legitimate, nondiscriminatory reason for Reinert's termination.

On August 20, 2007, LSI and Infineon entered into the APA memorializing the terms of the sale of the MPG business to Infineon. (Bento Dep. at 9-11). As explained by Paul Bento ("Bento"), LSI's Vice President – Law who negotiated the APA on behalf of LSI, the real value in selling MPG was the employees. (Id. at 11-12). Consequently, LSI and Infineon agreed that the transfer of all MPG employees was a material and crucial component of the transaction. (Id.; Bento Aff. ¶ 12). Pursuant to the APA, LSI agreed to terminate and transfer the employment of approximately 600 MPG employees, including Reinert, to Infineon upon the closing. (Bento Dep. at 13; Bento Aff. at ¶ 9). LSI made this decision without any regard to Reinert's or any other MPG employees' pension status. (Bento Aff. at ¶ 15). Thus, LSI has articulated a legitimate, nondiscriminatory reason for Reinert's termination. See Petrus, 102 Fed. Appx. at 971-72.

### 4. Reinert cannot meet her ultimate burden of proving that LSI's legitimate, nondiscriminatory reason for her termination was pretextual.

Assuming that Reinert could establish a *prima facie* case, her Section 510 claim still fails because she cannot meet her ultimate burden of proving that her termination was pretextual. See Jakimas, 485 F.3d at 786; Petrus, 102 Fed. Appx. at 971-72. To show pretext, Reinert must either directly persuade the Court that LSI's proffered reason for her termination was false or that an intent to interfere with her pension rights was the real reason for her termination. DiFederico, 201 F.3d at 206. Reinert can show neither.

7

Reinert cannot establish that LSI's proffered reason for her termination was false, because she does not dispute that she was terminated for any reason other than the sale of the MPG business:

Q: And what reason was given for your termination?

A: That I was going to be part of the business group that was transitioning to Infineon.

Q: **Do you contend that that was not the real reason why you were terminated by LSI?**

A: **No** . . . .

(Reinert Dep. at 70) (emphasis added).

The only argument that Reinert offers in support of her pretext claim is her unfounded belief that LSI allegedly terminated "maybe about a half dozen people" in MPG and did not transfer them to Infineon with the approximately 600 MPG employees upon the closing of the sale. (Reinert Dep. at 31-32, 62, 69). Reinert avers, without any factual support, that these unidentified individuals may have been afforded benefits pursuant to the Agere Force Management Program ("FMP"). (Reinert Dep. at 62). Pursuant to the FMP, employees who were placed "at risk" for a reduction in force were provided 60 days, with no work responsibilities, to remain on Agere's payroll. (Bento Aff. at ¶ 39). The 60 days provided an opportunity for employees placed "at risk" for a reduction in force to find other employment within Agere and served as a WARN compliance mechanism in the event of large layoffs. (Id. at ¶ 40). If "at risk" employees were unable to find other employment, they would be eligible to receive separation benefits pursuant to the terms of the FMP. (Id. at ¶ 41). Reinert alleges that had she been placed "at risk" for termination under the FMP, she could have elected to remain on LSI's payroll for an additional 60 days after the October 24, 2007 closing date, which would

8

have allowed her to reach her 49th birthday and qualify for a TLA under the Plan. (Reinert Dep. at 95-96).

Reinert's pretext argument must fail for two reasons. First, Reinert has no evidence that any MPG employee was actually treated more favorably than her with respect to the sale of the MPG business to Infineon. Regarding the alleged "maybe about a half dozen people" in MPG who Reinert believes LSI may have terminated rather than transferred to Infineon, Reinert admitted: (1) she did not know any of their names (Reinert Dep. at 62); (2) she did not know the circumstances surrounding their alleged terminations (Id. at 32); (3) she did not know if their alleged terminations had any impact on their pension status (Id.); and (4) she has no evidence that any of them actually received FMP benefits (Id. at 62, 110). Thus, Reinert has only her unsupported "belief" that a handful of people out of the approximately 600 MPG employees who transferred to Infineon may have been terminated by LSI and may have received FMP benefits. This unsupported belief that others may have been treated better than her is not evidence and cannot permit her to survive summary judgment. See Billet v. CIGNA Corp., 940 F.2d 812, 816 (3d Cir. 1999) (mere belief of discrimination does not make it so).[2]

Second, all of the approximately 600 MPG employees, including Reinert, were terminated from LSI pursuant to the sale of the MPG business, which precluded them from receiving benefits under the FMP. (Bento Aff. at ¶¶ 42-44, Ex. 4, pp. 2-3). The FMP, by its express terms, did not apply to employees who were terminated pursuant to the sale of a business and were offered employment by the purchasing entity:

> In addition, you will not be eligible for [FMP] Plan benefits if, in connection with, as a result of or in anticipation of a Disposition to a Purchaser, . . . you either fail

---

[2] Further, the actual evidence shows that all MPG employees were terminated from LSI effective October 24, 2007 and transferred to Infineon effective October 25, 2007; there were no exceptions. (Bento Aff. at ¶ 13).

9

> to apply for, or are offered, by means of a written or oral offer, (i) employment with a Purchaser . . ., or (ii) the opportunity to . . . otherwise render services as an employee . . . to a Purchaser . . . at any time within twelve (12) months prior to termination of employment.

(Reinert Dep. at 97-98, Dep. Ex. 22). Reinert admitted that she was offered employment by Infineon, and that, pursuant to the terms of the FMP, she was not eligible for FMP benefits. (Reinert Dep. at 54, 97-98). In fact, all of the MPG employees were offered employment with Infineon pursuant to the terms of the APA, and, consequently, none of those employees were eligible for or received FMP benefits. (Bento Aff. at ¶¶ 42-43).

Therefore, Reinert has presented (and can present) no evidence that her termination was pretextual, and her Section 510 claim must fail. Accordingly, LSI's Motion for Summary Judgment should be granted.

B.  **LSI Is Entitled To Summary Judgment Because Reinert Has Not Stated A Claim For Damages That Are Available Under ERISA.**

Reinert also has not stated a claim for damages that are available under ERISA. For this additional reason, LSI is entitled to summary judgment.

Reinert seeks to be awarded pension benefits that she would have received had she not been terminated effective October 24, 2007, but had remained an employee of LSI through October 29, 2007 and thereby qualified for a TLA under the Plan. Such damages are not available under Section 510 of ERISA. Eichorn v. AT&T Corp., 484 F.3d 644, 653 (3d Cir. 2007). In Eichorn, AT&T sold a subsidiary business and transferred the employees of that business to another entity. Id. at 646. Due to a no-hire clause in the sale agreement, plaintiffs were unable to return to their employment with AT&T for at least eight months. Id. at 647. Because plaintiffs were no longer employed by AT&T, they lost the opportunity to continue accruing service under their pension plans. Id. Plaintiffs sued AT&T and sought to be awarded damages in the form of additional pension benefits they would have received had they remained

10

AT&T employees and accrued additional service credit. Id.  In granting summary judgment to AT&T, the Court held that the relief plaintiffs sought was not "equitable" within the meaning of ERISA Section 502 and thus was not available under Section 510.[3]  Id. at 656-57.  In so holding, the Court reasoned:

> Here, however, the plaintiffs are seeking pension benefits for work they never did for AT&T or its former divisions, but which they argue they might have done had AT&T not adopted a hiring policy that they claim violated ERISA.  The remedy they seek is thus akin to "back pay," which is not an equitable remedy within the meaning of the statute. . . .
>
> [T]he plaintiffs are not seeking benefits that were wrongly withheld for work they performed for the defendants.  Rather, they are seeking an award of benefits as an approximation of the loss they suffered as a result of what they say is the defendants' violation of § 510 of ERISA.  As the Supreme Court explained in Great West, this amounts to a claim for *legal* damages, not *equitable* restitution, and thus is relief not available to the plaintiffs in this case. . . .

Eichorn, 484 F.3d. at 656-57 (internal citations omitted) (emphasis in original).

Exactly like the plaintiffs in Eichorn, Reinert is not seeking benefits that were due to her under the terms of the Plan at the time of her termination from LSI.  Reinert admitted that, as of the October 24, 2007 closing date, (1) she did not possess the eligibility criteria to qualify for a TLA, and (2) she had no benefits that were due and owing to her by LSI.  (Reinert Dep. at 83, 117).  Rather, Reinert is seeking damages in the form of pension benefits that she would have received had she remained an LSI employee after October 24, 2007 and accrued additional service credit under the Plan's TLA provision.  (Id. at 106-107).  This is precisely the type of legal damages that are not available under Section 510.  See Eichorn, 484 F.3d at 657.  Accordingly, even if Reinert could establish that LSI violated Section 510 by terminating her employment (which she cannot), her Section 510 claim still must fail because the relief she seeks

---

[3] The remedies available for a violation of Section 510 are limited to those set forth in Section 502 of ERISA, 29 U.S.C. § 1132.  Ingersoll Rand Co. v. McClendon, 498 U.S. 133, 144, 111 S. Ct. 478, 112 L. Ed. 2d 474 (1990); see also Eichorn, 484 F.3d at 651.

is not available to her under the statute.

### C. Reinert Should Not Be Permitted To Pursue A Claim Under Section 502 Of ERISA, But If She Is Permitted To Pursue Such A Claim, LSI Is Entitled To Summary Judgment On That Claim.

At her deposition, Reinert alleged that she should be entitled to additional pension service credit under the Plan because she continued to perform work for the benefit of LSI after her October 24, 2007 termination. (Reinert Dep. at 11-13). Specifically, after her employment with LSI ended, Reinert continued to assist LSI on a litigation matter ("the SEMC Litigation") that she had worked on while employed by LSI. (Id. at 15-19). Although admittedly an Infineon employee after October 24, 2007, Reinert argues that she should receive additional pension service credit for the time that she worked on the SEMC Litigation – one to three hours a week on average – because that work benefited LSI. (Id. at 17-19). Reinert conceded that she knew, before she became an employee of Infineon, that continuing to assist on the SEMC Litigation would be one of her job functions with Infineon (Id. at 17-18, 34-35). Nevertheless, she claims that she should have been given service credit for this work under the Plan and that, had she been given such credit, she would have qualified for a TLA. (Id. at 95-96). This claim amounts to a claim for benefits under Section 502 of ERISA, 29 U.S.C. § 1132.

Unlike Section 510, a participant may seek damages under Section 502 of ERISA "to recover benefits due to [her] under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). However, Reinert must be precluded from pursuing a Section 502 claim because: (1) she failed to plead a Section 502 claim in her Complaint and never sought to amend her Complaint to add such a claim; (2) she did not exhaust her administrative remedies before filing this action; and (3) she was not an LSI employee after October 24, 2007, and was not entitled to accrue additional pension service credit after that date.

### 1. Reinert failed to plead a Section 502 claim and never amended her Complaint to add such a claim.

Reinert's argument that she continued to perform work for LSI after October 24, 2007, thereby entitling her to additional pension service credit, must be rejected because Reinert did not plead a Section 502 claim and never amended her Complaint to add such a claim. The sole claim asserted by Reinert in her one count Complaint was for an alleged violation of Section 510 of ERISA. Under Rule 15(a) of the Federal Rules of Civil Procedure, Reinert had the opportunity to amend her Complaint within 21 days after filing it, by seeking LSI's written consent, or by seeking leave of court. Fed. R. Civ. P. 15(a)(1)(A), (a)(2). Reinert failed to exercise any of these options. Therefore, she should be precluded from pursuing a claim under Section 502 at this late stage of the litigation.

### 2. Reinert did not exhaust her administrative remedies under the Plan before filing this action.

Even if the Court were to allow Reinert to amend her Complaint to add a Section 502 claim, such claim would not survive summary judgment because Reinert failed to exhaust her administrative remedies under the Plan. See Bennett v. Prudential Ins. Co., 192 Fed. Appx. 153, 155-56 (3d Cir. 2006) (federal court will refuse to consider claims to enforce terms of a benefit plan if plaintiff has not first exhausted remedies available under the plan, unless exhaustion would be futile); D'Amico v. CBS Corp., 297 F.3d 287, 291 (3d Cir. 2002) (Third Circuit requires exhaustion of plan remedies for claims to enforce terms of a benefit plan); Harrow v. Prudential Ins. Co., 279 F.3d 244, 249 (3d Cir. 2002) (beneficiary must exhaust plan's administrative remedies before bringing action under Section 502 of ERISA). "The exhaustion requirement exists because 'trustees are granted broad fiduciary rights and responsibilities under ERISA . . . and implementation of the exhaustion requirement will enhance their ability to

expertly and efficiently manage their funds by preventing premature judicial intervention in their decision-making processes.'" Mansfield v. Lucent Techs., 2006 U.S. Dist. LEXIS 49455 at *10, July 20, 2006; 2006 WL 2040406 (D.N.J. 2006) (quoting Kilkenny v. Guy C. Long, Inc., 288 F.3d 116, 123 (3d Cir. 2002)).

Pursuant to Section 3.2 of the Plan, the Employee Benefits Committee ("Committee") and the Pension Plan Administrator ("Plan Administrator") shall grant or deny claims for benefits and will authorize disbursements according to the Plan. (Bento Aff. at ¶ 30; Ex. 3, p. 11). When a claim for benefits is denied, adequate notice setting forth the specific reasons for the denial will be provided to the participant or beneficiary, and the participants or beneficiary shall be informed of his/her appeal rights under the Plan. (Id. at ¶ 31; Ex. 3, p. 11). Section 3.3 of the Plan provides that the Committee shall serve as the final review committee under the Plan for the review of all appeals by participants and beneficiaries whose initial claims for benefits have been denied, in whole or in part. (Id. at ¶ 32; Ex. 3, p. 11). The Plan specifically states:

> Any Participant or beneficiary whose claim for benefits has been denied, in whole or in part, may (and must for the purpose of seeking any further review of a decision or determining any entitlement to a benefit under the Plan), within sixty (60) days after receipt of notice of denial, submit a written request for review of the decision denying the claim.

(Id. at ¶ 33; Ex. 3, p. 11). Thereafter, the Committee will make a full and fair review of the decision and notify the claimant in writing of the review decision, and the reasons for the review decision. (Id. at ¶ 34). The Plan also provides for further appeal rights. (Id. at ¶ 35).

In this case, Reinert became aware of LSI's intention to sell the MPG business to Infineon in August 2007, and she knew that the sale was forecasted to close in October 2007. (Reinert Dep. at 43, 46-47, Exs. 2, 3). Reinert knew that she could not transfer to any other position within LSI to remain an LSI employee after the closing date, and that she would stop

14

accruing pension service credit once her employment with LSI terminated. (Id. at 61, 79-80, 87, Ex. 2). Reinert was also aware prior to her termination from LSI that she would continue to assist on the SEMC Litigation after she became an employee of Infineon. (Id. at 34-35).

Despite this advance knowledge of her circumstances, Reinert never submitted any claim or request to the Plan Administrator to inquire whether she would be eligible for additional service credit based on the ongoing SEMC Litigation work, and she never sought review of the decision to stop her pension service accrual after her transfer to Infineon. (Bento Aff. at ¶ 36). As such, she must be precluded from pursuing a Section 502 claim. See D'Amico, 297 F.3d at 293 ("Plaintiffs who fail to make known their desire for benefits to a responsible company official are precluded from seeking judicial relief.").

Moreover, Reinert cannot be excepted from the exhaustion requirement because she has no evidence that resorting to the Plan's administrative remedies would have been futile. Mere allegations of futility will not satisfy Reinert's burden of proof. Mansfield, 2006 U.S. Dist. LEXIS 49455 at *10-11. Rather, she must make a clear and positive showing of futility. Id. at *11 (citing Harrow, 279 F.3d at 250).

Here, Reinert was fully aware of the Plan's internal administrative procedures, and the Plan's compliance with those procedures, because she had initiated a claim with the Plan Administrator in April 2008 regarding the calculation of her lump sum payment. (Reinert Dep. at 104; Ex. 20). Reinert's April 2008 claim to the Plan Administrator focused on an alleged delay in calculating her lump sum payment, which Reinert asserted caused her to receive a lesser pension distribution than what had originally been estimated due to a change in the variable interest rate. (Id. at 104-106; Exs. 20, 21). In responding to Reinert's claim, the Plan Administrator explained the basis for the denial of her claim and, in accordance with the Plan's

15

administrative procedures, also advised Reinert of her appeal rights under the Plan. (Id. at 106, Ex. 21). Reinert declined to file an appeal. (Id.).

Given Reinert's knowledge and prior use of the Plan's administrative procedures, she cannot demonstrate that resorting to those procedures would have been futile. Consequently, she cannot be absolved of her failure to exhaust, and LSI is entitled to summary judgment on her Section 502 claim (if the Court elects to consider it.)

### 3. Reinert was not an LSI employee after October 24, 2007, and was not entitled to accrue additional pension service credit after that date.

As set forth above, Reinert alleges that she should be entitled to additional pension service credit under the Plan because she continued to perform work for the benefit of LSI after her October 24, 2007 termination. (Reinert Dep. at 11-13). Reinert's argument is flawed in several respects. First, and most importantly, like all other MPG employees, Reinert's employment with LSI terminated on October 24, 2007. (Id. at 41, 126). Consequently, she was no longer a "Participant" in the Plan after that date and was not entitled to receive additional pension service credit. (Bento Aff. at ¶ 29, Ex. 3, p. 7; Reinert Dep. at 87).[4]

Reinert admitted that her employment with LSI was terminated effective October 24, 2007. (Reinert Dep. at 111). Thereafter, she was employed by Infineon for almost 1 year from October 25, 2007 through August 20, 2008, and was compensated and provided benefits solely by Infineon during that time period. (Id. at 34, 123, 128). Reinert also admitted that she was provided with severance benefits from Infineon when her employment with Infineon was

---

[4] Under the Plan, "Participant shall mean any Employee who is employed by a Participating Company who meets the eligibility criteria of Section 4.1(a) with respect to the Service Based Formula or the eligibility criteria of Section 4.1(b) with respect to the Account Balance Program, who is accruing or entitled to a pension benefit under either the Service Based Formula or the Account Balance Program." (Bento Aff. at ¶ 21, Ex. 3, p. 7).

16

subsequently terminated in August, 2008. (Id. at 120; Ex. 26). In conjunction with her request for receipt of unemployment compensation benefits, Reinert represented to the Allentown UC Service Center that Infineon was her employer from October 25, 2007 through August 20, 2008, and Infineon set her work hours, pay and salary. (Id. at 125). She also represented that after October 24, 2007 she had no employee or contractor relationship with LSI, and received no compensation from LSI for her assistance on the SEMC Litigation while she was employed by Infineon. (Id. at 126-27).

Notably, Reinert's assistance was limited to an average of one to three hours per week, and she conceded this was by no means her primary job responsibility with Infineon:

> Q. Is it fair to say that you performed other work for Infineon after you became an employee of Infineon?
>
> A. Yes.
>
> Q. And what were your other job duties and responsibilities?
>
> A. I was a program manager, so I managed development of integrated circuits that are used in cell phones and wireless communication devices.
>
> Q. Just so we're clear, you are not in any way contending that when you became an employee of Infineon you were devoting a significant portion of your time to the SEMC litigation, is that right?
>
> A. No.

(Reinert Dep. at 17-19).

The work that Reinert performed on the SEMC Litigation was admittedly part of her job functions with Infineon. (Reinert Dep. at 34-35). In fact, pursuant to Section 5.6(c) of the APA:

> [Infineon] acknowledge[d] that [LSI] is defending a legal proceeding as described in Schedule 3.9 relating to the Mobility Business (the "Retained Legal Proceeding"), and that [LSI] is retaining all liability and responsibility for, and control of, the Retained Legal Proceeding following the Closing Date. In connection with such proceeding, [Infineon] agree[d] (i) to use its reasonable commercial efforts to cooperate fully in the discovery and defense by [LSI] of the

17

> Retained Legal Proceeding by affording [LSI] and its representatives full and complete access to documents (as defined by the Federal Rules of Civil Procedure) and the Transferred Employees and (ii) to take such other actions reasonably requested by [LSI] (for which [LSI] does not have reasonably equivalent alternative) relating to the Purchased Assets and the Transferred Employees not determined by [Infineon] in its good faith judgment to materially and adversely impact [Infineon].

(Bento Aff. at ¶ 16, Ex. 1, p. 48). Reinert was fully aware of her obligation to continue providing assistance on the SEMC Litigation before she began her employment with Infineon. (Id. at 34-35). Moreover, Reinert was not the only former LSI MPG employee who continued to provide assistance on the SEMC Litigation while employed by Infineon. (Bento Aff. at ¶ 18). Like Reinert, no former MPG employee was compensated by LSI for their work on the SEMC Litigation after they became employed by Infineon. (Id. at ¶ 19). These facts show that Reinert was not an LSI employee after October 24, 2007. See Nationwide Mutual Ins. Co. v. Darden, 503 U.S. 318, 323, 112 S. Ct. 1344, 117 L. Ed. 2d 581 (1992).

Finally, Reinert acknowledged that she signed an independent contractor agreement with LSI in October 2008 regarding the SEMC Litigation after her termination from Infineon. (Reinert Dep. at 120). Pursuant to that agreement, LSI paid Reinert $80 per hour for any services performed on the SEMC Litigation. (Id. at 121). The agreement clearly states: "[y]our services will be as an independent contractor, and nothing herein shall deem to make you an employee of LSI or Sidley Austin LLP." (Id. at Ex. 23). The Third Circuit has recognized that such agreements are "strong evidence" of an independent contractor relationship. See Brown, 581 F.3d at 181. Thus, Reinert cannot establish that she continued to be employed by LSI after October 24, 2007, and she cannot show that she was entitled to additional pension service credit under the terms of the Plan. Consequently, LSI is entitled to summary judgment on any Section 502 claim.

18

## V. CONCLUSION

For the foregoing reasons, LSI respectfully requests that the Court grant its Motion for Summary Judgment and dismiss Plaintiff's Complaint with prejudice.

    Respectfully submitted,

*/s/ Shannon H. Paliotta*

Robert W. Cameron (PA ID No. 69059)
  bcameron@littler.com
Shannon H. Paliotta (PA ID No. 91000)
  spaliotta@littler.com
**LITTLER MENDELSON, P.C.**
625 Liberty Avenue, 26th Floor
Pittsburgh, PA  15222
(412) 201-7600 Phone
(412) 456-2377 Fax

Dated: April 16, 2010      *Attorneys for Defendant, LSI Corporation*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of April 2010, a copy of the foregoing document was filed using the Eastern District of Pennsylvania's ECF system, through which this document is available for viewing and downloading, causing a notice of electronic filing to be served upon the following counsel of record:

Donald P. Russo, Esquire
dprusso1@verizon.net
117 East Broad Street
P.O. Box 1890
Bethlehem, PA  18016-1890

*/s/ Shannon H. Paliotta*
Shannon H. Paliotta

Firmwide:94790667.1 042480.1048