## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRENDA REINERT, | : | |
| | : | No. 09-cv-3097 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LSI CORPORATION | : | |
| | : | JURY TRIAL DEMANDED |
| Defendant. | : | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

Plaintiff Brenda Reinert, by and through her undersigned counsel, hereby responds to the Motion for Summary Judgment filed by the Defendant in the case at bar, arguing as follows:

**I.     BACKGROUND:**

In her Complaint, Plaintiff Brenda Reinert ("Reinert") alleges that on or about October 22, 2007, an asset sale took place in which Infineon Technologies North America (IFNA) purchased the assets of the Mobility Products Group (MPG), a part of LSI.  The asset sale was for a total amount of $450 million, plus a $50 million payout if Infineon achieved the revenue numbers that LSI had represented in negotiations and due diligence.  At the time of the asset sale, Reinert had twenty-six (26) years of service and was approximately 5 days short of her forty-nine (49th) birthday.  The Defendant adopted a company-wide plan known as the Agere Systems Management Pension Plan ("the Plan"), which was part of its existing employee benefit plan.

Under the terms of the sale between seller and buyer, the sale closed just prior to her 49th birthday on October 29, 2007, and she missed by just a few days the chronological age required

for a service pension.  Reinert claims that if she had reached age forty-nine (49) while still on the

LSI payroll, she would then qualify for a one-year unpaid leave of absence.  If at the end of that

leave period, her chronological age had been fifty (50), in combination with his more than thirty

(30) years of pension-credited service (earned through successive employment at AT&T, Lucent,

Agere and LSI and after the one year transitional leave of absence), that would have qualified her

for early retirement under a service pension.  However, Reinert was forced to depart from her

position prior to his 49th birthday, and now will qualify for full pension benefits only upon

reaching age 65.

The Defendant's original Pension Plan stated that employees could receive early

retirement benefits at age fifty (50) or with after fifteen years of service, or at any age with 30

years of service.  Defendant amended the plan in 1997 to change the base pay period as well as

the multiplier factor for pension calculation.  The Defendant changed the multiplier in the plan

from 1.6% to 1.4%.  Defendant amended this plan in 2004 to discontinue this early retirement

benefit and in fact stated publicly that it did not want to encourage people to leave the company.

At the time of Plaintiff's separation from the Defendant Corporation, she contends that she had a

right to receive full severance pay benefits.  First, she received paychecks after the Infineon sale,

second, LSI paid severance in the sale of another business under its umbrella and three, there is

interaction between the two plans.  Additionally, Reinert returned to work for the Defendant after

she was laid off by Infineon.

In selling the division, the company apparently believed that severance was not required

because the jobs would continue.  However, LSI allowed people sixty days after their

termination notification.  Since the sale of the division was not certain until the closing, Reinert

claims entitlement to this 60 days' notification. A WARN notice of a plant closing cannot apply to an uncertain event, when at same time Agere told its employees in Q&A to continue business as usual.  Moreover, as noted, Reinert continued to assist the Defendant in other litigation for the Defendant and she received paychecks for this work.  This continued Reinert's relationship with the company past the date when the Infineon sale was transacted.

Reinert contends that the actions taken by the Defendant were intended to prevent the plaintiff from receiving any severance benefits sponsored by the Defendant. Reinert's Appendix in Opposition to Defendant's Motion for Summary Judgment includes ***Reinert's Affidavit***, his deposition testimony, and the deposition of Defendant's in-house counsel, Paul Bento.

**II.    ARGUMENT:**

    **A.  REINERT'S EVIDENCE ESTABLISHES A CAUSE OF ACTION UNDER SECTION 510 OF ERISA.**

        **1.   Effect of Supreme Court's Inter-Modal Decision.**

Section 510 of ERISA provides in part:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan....
29 U.S.C. § 1140.

ERISA § 510 prohibits employers from making adverse employment decisions with specific intent to interfere with an employee's attainment of rights under an ERISA plan.  Turner v. Schering-Plough Corp., 901 F.2d 335, 347 (3rd Cir. 1990); Gavalik v. Continental Can Co., 812 F.2d 834, 851 (3rd Cir. 1986), *cert. denied*, 484 U.S. 979, 108 S. Ct. 495, 98 L.Ed.2d 492 (1987). See also, Blain v. Bell Atlantic of Pa., 42 F.Supp.2d 527, 532 (E.D. Pa. 1999) ("To recover under Section 510, the employee must show that the employer made a conscious decision to interfere

with the employee's attainment of pension eligibility or additional benefits"); <u>Dewitt v. Penn-Del Directory</u>, 106 F.3d 514, 522 (3rd Cir. 1997) ("Congress enacted Section 510 primarily to prevent employers from discharging or harassing their employees in order to keep them from obtaining ERISA-protected benefits").

The provisions of ERISA §510 should be ***liberally construed*** to give effect to the remedial and human rights purposes of the Act.   ERISA is clearly a remedial statute. <u>Jakimas v. Hoffmann-La Roche, Inc.</u>, 485 F.3d 770, 784 (3d 2007); <u>Conkwright v. Westinghouse Elec. Corp.</u>, 933 F.2d 231, 236 (4th Cir. 1991); and <u>Kross v. Western Elec. Co., Inc.</u>, 701 F.2d 1238, 1242 (7th Cir. 1983).   Federal courts have long held that remedial statutes should be given liberal construction to affect intended purposes.  See <u>Sutton v. United Air Lines, Inc</u>., 527 U.S. 471, 504 (1999); <u>Tcherepnin v. Knight</u>, 389 U.S. 332, 336 (1967); and <u>In re Carter</u>, 553 F.3d 979, 985-986 (6th Cir. 2009). ERISA §510's plain language prohibits discharges and discriminatory acts taken with an intent to prevent an employee's attainment of retirement plan benefits.

Managerial decisions made in the context of worksite closings or sales of a business can violate ERISA §510.  Defendant cannot argue that ERISA §510 is inapplicable to managerial decisions made during plant closings or sales of a part of a business.  ERISA §510 applies to discharges occurring in the context of plant closings.  In <u>Inter Modal Rail Employees Ass'n v. Atchison, Topeka and Santa Fe Ry</u>., 520 U.S. 510, 117 S.Ct. 1513, 137 L.Ed.2d 763 (1997) [hereafter Inter Modal] the U.S. Supreme Court recognized that ERISA's provisions grant employers wide flexibility to reduce or even eliminate promised benefits in the face of an economic downturn.  <u>Id</u>. at 515.  However the Court's decision also recognized that this flexibility is counterbalanced by ERISA §510 which prohibits employers from "circumvent[ing]

the provision of promised benefits." <u>Id</u>. (*citations omitted*).  The decision noted further that an employer seeking to alter promised benefits must adhere to the plan's procedures.  <u>Id</u>. at 516.

The Supreme Court's decision in Inter-Modal Rail Employees allowed both vested benefits and unvested welfare benefits to employees whose jobs were lost due to outsourcing. The decision supports ERISA Section 510 employee rights but does not prevent employers from amending benefits.  In <u>Inter-Modal</u>, the Supreme Court rejected the view that, because an employer remains free to amend or eliminate a welfare plan, an employee has no present right to future benefits and cannot maintain a § 510 action for interference with those benefits.  <u>Id</u>., 117 S.Ct. at 1515.  Although an employer may under some circumstances unilaterally amend or even eliminate its welfare plan, the Court held that otherwise it may not act with a purpose that contravenes  §510. <u>Id</u>. at 1516.  Inter-Modal makes it clear that even though an employee may lack a present legal right to receive benefits in the future, an anticipated right to receive benefits may not be denied in a manner that would contravene § 510.

### B.    <u>REINERT HAS ESTABLISHED A PRIMA FACIE CASE.</u>

### 1.    <u>Ignoring Reinert's Work On The SEMC Litigation And The Subsequent Paychecks Shows Specific Intent.</u>

To establish an ERISA §510 claim, an employee must show "that an employer had a specific intent to violate" the employee's ERISA rights.  <u>Smith v. Ameritech</u>, 129 F.3d 857, 865 (6th Cir. 1997).  The employee is not required to show that the employer's sole intent was to interfere with ERISA rights but rather that it was a "motivating factor" in the employer's decision.  <u>Humphreys v. Bellaire Corp</u>., 966 F.2d 1037, 1043 (6th Cir. 1992).  Additionally, the employee must establish a causal link between the adverse employment decision and the

likelihood of future benefits.  Pennington v. Western Atlas, Inc., 202 F.3d 902, 906 (6th Cir.

2000) (*quoting* Smith v. Ameritech, *supra*).

The aggrieved party can show specific intent through direct evidence or, in the absence of

direct evidence through a showing of: 1) prohibited conduct; 2) taken with the purpose of

interfering; with 3) an employee's right to attain plan benefits.  Smith v. Ameritech, *supra* at

865.  In the absence of direct evidence, courts employ a burden shifting analysis, similar to that

found in Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67

L.Ed.2d 207 (1981).  However the *Burdine* burden shifting approach only applies "if there is no

direct evidence of the employer's motivation." Humphreys v. Bellaire Corp., *supra* at 1043

(*emphasis added*).

The Third Circuit Court of Appeals has also held that Section 510 of ERISA prohibits

employers from discharging or harassing their employees in order to keep them from obtaining

[employee] benefits.  DeWitt, *supra*, 106 F.3d at 522 (*quoting* Haberern v. Kaupp Vascular

Surgeons Ltd., 24 F.3d 1491, 1501 (3d Cir. 1994)).  To recover, a plaintiff must demonstrate that

the defendant had the "specific intent" to violate Section 510.  Id.  This requires the plaintiff to

show that "the employer made a conscious decision to interfere with the employee's attainment

of pension eligibility or additional benefits." Id. at 523 (*citing* Gavalik, *supra*).  See also, West v.

Butler, 621 F.2d 240, 245 (6th Cir. 1980) (This section was designed to prevent employers from

discharging or harassing" employees to preclude "them from obtaining vested pension rights).

While "[e]mployers or other plan sponsors are generally free under ERISA . . . to adopt, modify

or terminate" pension benefit plans, Coomer v. Bethesda Hosp. Inc., 370 F.3d 499, 508 (6th Cir.

2004), this discretion does not permit them to discharge employees or alter their plan rights to

"circumvent the provision of promised benefits." <u>Inter-Modal Rail</u>, *supra*, 520 U.S. at 515

(1997).  The D.C. Circuit has pointed out that Congress's use of the term "discharge" in § 510

comes in the context of other individually focused terms like "fine, suspend, expel, [and]

discipline." <u>Andes v. Ford Motor Co</u>., 70 F.3d 1332, 1337 (D.C. Cir. 1995). Notably, the *Andes*

court explicitly pointed out the possibility that some employer might unscrupulously sell or close

a plant to shake off employees ***on the cusp of establishing benefit eligibility.***  70 F.3d at 1338.

    In the case at bar, evidence shows that Reinert did not receive a transition formula

calculation from Rod Astl until she requested this. Furthermore, she was told he was ineligible

for a Transition Leave of Absence.  This supports two alternate conclusions: If the HR office and

the pension service center were confused about the eligibility, even though the plan wording

dominates, there is some interpretation of the plan which defies logic and confused two separate

people in HR as supported by the mails received (Reinert Affidavit).  At the same time, if the

confusion regarding the plan wording is not the reason for the emails, then it must be concluded

that an attempt at interfering with benefits was occurring.  In either case, this court should allow

the case to proceed.

### 2.    <u>Effect of Eichorn Litigation</u>.

    In Defendant's Memorandum, Defendant cites the <u>Eichorn</u> litigation regarding

lack of a compensatory damages remedy as being somehow fatal to the Plaintiff's case.  Nothing

could be farther from the truth.  <u>In Leszczuk, et al vs. Lucent Technologies, Inc</u>., Civil Action

No. 03-CV-05766, at 13-14, this court denied summary judgment to this Defendant in another

ERISA Section 510 case, holding that:

> We are guided by the Third Circuit's decision in <u>Eichorn v. AT&T</u>, 248 F.3d 131 (3d Cir.
> 2001). In that case, the Third Circuit reversed the district court's granting of summary

judgment in favor of defendants, concluding that plaintiffs had presented sufficient circumstantial evidence of specific intent to interfere with plaintiffs' benefit plans to permit the case to go to trial. The case involved an agreement between Lucent Technologies, Incorporated, an AT&T affiliate, and Texas Pacific Group. Texas Pacific Group had purchased Paradyne Corporation from Lucent. The agreement, entered after the purchase, provided that Lucent and other AT&T affiliates would not hire Paradyne employees for an eight-month period. The case arose because the Paradyne employees had accrued pension rights under their former AT&T pension plans. The pension plan had a "bridging provision" which allowed them to keep their level of accrued benefits if they returned to employment with AT&T within six months. The effect of the eight month agreement was to terminate the Paradyne employee's AT&T pension benefits. Plaintiffs brought a section 510 claim. In support of their claim in Eichorn, plaintiffs argued that the six-month and eight-month periods were suspiciously close in time. Plaintiffs also argued that a confidential, internal memorandum between Lucent officials acknowledged the effect of the eight-month agreement. Additionally, plaintiffs noted the economic benefits that AT&T and Lucent received from the no-hire agreement. The Third Circuit concluded that, although the evidence may not be sufficient for plaintiffs to prevail on their claims at trial, there was sufficient evidence to allow the case to proceed to trial.

However, the Eichorn litigation continued, and there has been a final disposition. See Eichorn v. AT&T Corp., __ F.3d __, No. 05-5461, 2007 WL 1266133 (3d Cir. May 2, 2007). In the 2007 decision, the Third Circuit held that the only relief available in ERISA § 510 interference claims is "appropriate equitable relief," but not compensatory damages. After the Third Circuit addressed the claim in 2001 and remanded the case, the defendants sought summary judgment once again. This time, the defendants argued that the relief the plaintiffs were seeking was not appealed, arguing that the relief they were seeking was available under either subsection (a)(1)(B) or (a)(3) of § 502.

Characterizing the relief requested as essentially compensatory damages, the Third Circuit rejected the plaintiffs' arguments and affirmed. Subsection (a)(1)(B) allows a participant to collect benefits and enforce rights "under the terms of his plan." These remedies are only available to participants who qualify to collect benefits or exercise rights under a plan. In Eichorn, the plaintiffs alleged that the defendants "interfered with their ability to become eligible

for further benefits, not that the defendants have breached the terms of the plan itself." <u>Eichorn</u>, 2007 WL 1266133, at * 7.  Therefore, the Third Circuit ruled, subsection (a)(1)(B) was not an appropriate vehicle for enforcing a § 510 interference claim.  The second provision on which the plaintiffs relied, § 502(a)(3), allows participants to obtain "appropriate equitable relief."  Under <u>Great-West Life & Annuity Ins. Co. v. Knudson</u>, 534 U.S. 204, 210 (2002), this term is limited to the categories of relief typically available in equity in the days of the divided bench.  The remedy the plaintiffs were seeking was the value of the benefits they would have received if the defendants had not prevented them from returning to Lucent or another AT&T company.  The appeals court ruled that this relief, which is based on the plaintiffs' loss, not the defendants' gains, is "legal," not "equitable."

Plaintiffs in <u>Eichorn</u> could not salvage their claim by framing the requested relief as a decree requiring Lucent to adjust its pension records retroactively to create an obligation to pay the plaintiffs more money.  <u>Eichorn</u>, 2007 WL 1266133, at * 9.  <u>Eichorn</u>, however, is clearly distinguishable from the facts in the case at bar.  Reinert is not arguing that she should be returned to LSI.  Rather, she is arguing that under the facts at hand, she did in fact have enough or could have had enough service time.  Reinert is arguing that if the Defendant had in fact properly applied the terms of its own plan, it would have credited her for the service time he had earned.  Moreover, if service time had to be bridged, the company's policies would have provided for such.  As Reinert's subsequent work on the SEMC litigation and her paychecks indicate, she either had or could have attained the time necessary to reach the necessary service time to obtain the full pension.  When Defendant acted with specific intent to deprive her of the

time she had earned, they violated Section 510 of ERISA.  In sum, the remedy Reinert seeks is equitable in nature, and would not require Defendant to pay him compensatory damages.

### 3.   Circumstantial Evidence is Allowed.

The plaintiff may use both direct and circumstantial evidence to establish specific intent, but when the plaintiff offers no direct evidence that a violation of § 510 has occurred, the court applies a shifting burdens analysis, similar to that applied in Title VII employment discrimination claims.  See Gavalik, 812 F.2d at 851-53 (applying the McDonnell Douglas, 411 U.S. 792, 802 (1973), shifting burdens mechanism).  In this burden shifting analysis, the plaintiff must first establish a prima facie case by showing: "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." Id. at 852.  If the plaintiff is successful in demonstrating her *prima facie* case, the burden then shifts to the defendant employer, who must articulate a legitimate, nondiscriminatory reason for the prohibited conduct.  If the employer carries its burden, the plaintiff then must persuade the court by a preponderance of the evidence that the employer's legitimate reason is pretextual.  See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 25253 (1981).  A plaintiff need not prove that `the sole reason for his [or her] termination was to interfere with [employee benefit] rights.  DeWitt, 106 F.3d at 522 (*quoting* Gavalik, 812 F.2d at 851).

As the Supreme Court has noted "Congress viewed this section as a crucial part of ERISA because, without it, employers would be able to circumvent the provision of promised benefits." Ingersoll-Rand v. McClendon, 498 U.S. 133, 143 (1990) (*citing* S. Rep. No. 93-127, pp. 35-36 (1973); H.R. Rep. No. 93-533, p. 17 (1973)). "Congress enacted Section 510 'primarily

to prevent unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension benefits.'" <u>Eichorn v. AT & T Corp.</u>, 248 F.3d 131, 149 (3d Cir. 2001) ("Eichorn I") (citing <u>Dewitt v. Penn-Del Directory Corp.</u>, 106 F.3d 514, 522 (3d Cir. 1997)).  The purpose of section 510 is to protect plan participants from employment action that is improperly aimed at preventing the vesting of their pension rights.  <u>Ingersoll-Rand</u>, 498 U.S. at 143.  See also <u>Wood v. Prudential Ins. Co. of America</u>, 207 F.3d 674, 685 (3d Cir. 2000). In enacting section 510, Congress' primary aim was to prevent "unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights" or other benefits.  <u>Meredith v. Navistar Int'l Transp. Corp.</u>, 935 F.2d 124, 127 (7th Cir.1991) (<i>quoting</i> <u>Conkwright v. Westinghouse Elec. Corp.</u>, 933 F.2d 231, 237 (4th Cir.1991)). For example, section 510 of ERISA protects employees against dismissal by employers who seek to limit costs of health benefit plans by preventing the use of such benefits.  In <u>Conkwright</u>, the plaintiff was laid off at age 60.  He was fully vested in his pension benefits, having worked for Westinghouse for almost 20 years.

The Fourth Circuit Court of Appeals looked to the legislative history and decided that Congress's intent to provide "broad remedies" for interference with pension rights militated for the application of the Interference Clause in the case at hand.  However, the Fourth Circuit ultimately granted summary judgment to Westinghouse because Conkwright failed to prove Westinghouse had the specific intent to interfere with his pension benefits.

As noted, Section 510 of ERISA makes it unlawful for any person to discharge, fine, suspend, expel, discipline, or for the purpose of interfering with the attainment discriminate against a plan participant (The protections of § 510 also extend to potential participants who

would have participated in the plan but for the unlawful action.  See Saporito v. Combustion

Engineering Inc., 843 F.2d 666 (3d Cir.1988)), or beneficiary for the purpose of interfering with

or preventing the exercise of any right to which he or she is entitled or to which he or she may be

become entitled to under the provisions of the plan, or Title I of ERISA.

     Section 510 of ERISA can come into play in connection with a reduction in force.  See,

*e.g.* Gavalik, *supra.*  In *Gavalik*, the employer developed and implemented a system to identify

Continental's unfunded pension liabilities so as to avoid triggering future vesting by placing

employees who had not yet become eligible for break- in-service on layoff, and to retain those

employees whose benefits had already vested.  The court concluded that this was a violation of

Section 510 of ERISA.  Questions have arisen as to whether a benefit that is contingent on the

occurrence of an unpredictable event, such as a plant shutdown or an involuntary separation, is a

retirement-type subsidy and, thus, protected by Section 411(d) of the Internal Revenue Code,

added to the Code by 301 of the Retirement Equity Act of 1984, Pub. L. No. 98-397, 98 Stat.

1426, 1450-51 (1984).  Since the enactment of REA, the Third Circuit Court of Appeals has held

that an unpredictable contingent event benefit is protected, while one has held that it is not.  See

Bellas v. CBS, Inc., 221 F. 3d 517 (3rd Cir. 2000), *cert. denied*, 531 U.S. 1104 (2001).

     In *Bellas*, the Court held that Plant Shutdown benefits may be considered as vested

benefits in an ERISA context and the employer may not be able to modify the ERISA Plan to

eliminate those benefits.  A separation benefit is both an early retirement benefit and a

retirement-type subsidy to the extent it provides for the payment of normal retirement benefits

that continue beyond normal retirement age.  See also, Richardson v. Pension Plan of Bethlehem

Steel Corp., 67 F. 3d 1462 (9th Cir. 1995), withdrawn, 91 F.3d 1312 (9th Cir. 1996), modified,

112 F.3d 982 (9th Cir. 1997) (shutdown benefit is a retirement-type subsidy protected under anticutback rule, opinion withdrawn and modified because court later found plan amendment not valid), and <u>Harms v. Cavenham Forest Industries, Inc</u>., 984 F. 2d 686 (5th Cir.), *cert. denied*, 510 U.S. 944 (1993) (involuntary separation benefit is a retirement-type benefit protected under the anticutback rule).

A list of people nearing eligibility was compiled by another based on HR data available. This estimate showed that the company saved two million dollars.  However, the circumstances show that one motivating factor was that the company believed the business would face increasing challenges in the years to come, and that the economies of scale warranted the cash out and sale to a larger entity such as Infineon.  In doing so, the company shed responsibility for a number of employees nearing pension eligibility, at the same time receiving cash from the buyer and avoiding the risks of the business and the costs of severance if the business needed to be shut down.  The benefit to the company was great, and the deal was at the detriment of a number of employees.

### 4.    ERISA's Specific Intent Requirement.

To prove a violation of section 510, a plaintiff must establish more than a loss of benefits; he must demonstrate that their employers terminated them with the specific intent of preventing or retaliating for the use of benefits.  See <u>Little v. Cox's Supermarkets</u>, 71 F.3d 637, 642 n. 3 (7th Cir.1995) (holding that "a plaintiff in an ERISA action must demonstrate that the employer had the 'specific intent' to violate the statute."); <u>Teumer v. General Motors Corp</u>., 34 F.3d 542, 550 (7th Cir.1994) ("A plaintiff seeking relief under § 510 must establish that the

complained of action affecting his employment situation was taken by his employer with the specific intent of interfering with his benefit rights.").

In other words, "the plaintiff must ultimately show that a desire to frustrate [the plaintiff's] attainment or enjoyment of benefit rights contributed toward the employer's decision and [the plaintiff] can avoid summary judgment only if the materials properly before the district court, construed sympathetically, allow for such a conclusion." Id.  See Turner v. Schering-Plough Corp., 901 F.2d 335, 347 (3d Cir.1990) ("To recover under section 510 the employee must show that the employer made a conscious decision to interfere with the employee's attainment of ... benefits."). " '[N]o action lies where the alleged loss of rights is a mere consequence, as opposed to a motivating factor behind the termination.' " Meredith, 935 F.2d at 127 (quoting Dytrt v. Mountain State Telephone and Telegraph Co., 921 F.2d 889, 896 (9th Cir.1990)).

When attempting to establish intent under section 510 of ERISA, "[p]roof of pretext is required." Little, 71 F.3d at 643. Such proof may be supplied by direct or circumstantial evidence.  Id.  "The sufficiency of that evidence, however, clearly remains within our review." Id.  As noted earlier, circumstantial evidence of discrimination can be presented through the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973), and applied by the Court in Grottkau v. Sky Climber, Inc., 79 F.3d 70, 73 (7th Cir.1996). "In order to make out a prima facie case under section 510, the plaintiff must show that he (1) belongs to the protected class; (2) was qualified for his job position; and (3) was discharged or denied employment under circumstances that

provide some basis for believing that the prohibited intent to retaliate was present." Id. (citing Little, 71 F.3d at 642).

As noted in Kinkead v. Southwestern Bell Telephone Co., "[t]o establish a *prima facie* case of retaliation under § 510 of ERISA, a claimant must demonstrate the existence of a causal connection between participation in a statutorily protected activity and an adverse employment action ... § 510 does not prohibit firing an employee who becomes less productive because of an illness or disability." 49 F.3d 454, 456-57 (8th Cir.1995). Consequently, it is helpful to look at the Third Circuit's decision in Kowalski v. L & F Products, where the court held that a company policy forcing an employee to choose between losing his job for the exercise of his rights under ERISA-protected benefits or keeping his job and forcing him to give up his benefits would be inherently unfair, or "a quintessential Hobson's choice." 82 F.3d 1283, 1288 (3d Cir.1996).

In the case at bar, this court should consider applying the test set forth by Judge Aldisert in Furcini v. Equibank, 660 F.Supp. 1436 (W.D. Pa. 1987). Under the *Furcini* standard, in order to satisfy plaintiff's prima facie burden, he need only show that: (1) he was a candidate for ERISA benefits; (2) that he was denied benefits; and (3) that he met the conditions for receiving benefits. Id. Section 1140 of ERISA has been analyzed as offering protection against two types of conduct. In Furcini v. Equibank, NA, 660 F. Supp. At 1439, the court described these as the "exercise clause" (covering adverse actions (there, a discharge) taken because a participant availed himself of an ERISA right) and the "interference clause" (covering interference with the attainment of a right under ERISA). In Stiltner v. Beretta U.S.A. Corp., No. 94-1323, 1995 WL 25643, at *7-8, *9 n.9 (4th Cir. Jan. 18. 1995), rev'd en banc on other grounds, 74 F.3d 1473 (4th

Cir. 1996), the court used the terminology "retaliation" or "anti-retaliation" clause or provision

(for Furcini's "exercise clause"), and "'interference-with-attainment' provision."

In sum, Reinert has stated a prima facie case under Section 510.  To state a *prima facie*

case, an employee must show that there was: "(1) prohibited employer conduct (2) taken for the

purpose of interfering (3) with the attainment of any right to which the employee may become

entitled." Humphreys v. Bellaire Corporation, 966 F.2d 1037, 1043 (6th Cir.1992) (*citing*

Gavalik, *supra*).  Thus, the plaintiff "must show that an employer had a specific intent to violate

ERISA." Humphreys, 966 F.2d at 1043 (quoting Rush v. United Technologies, Otis Elevator

Div., 930 F.2d 453, 457 (6th Cir.1991)).  However, the plaintiff need not show that the

employer's sole purpose in discharging her was to interfere with her entitlement to benefits but

rather only that it was "a motivating factor" in the decision.  Humphreys, 966 F.2d at 1043.  As

indicated in Conkwright, *supra*,  933 F.2d  237, Sections 502 and 510 of ERISA together protect

the panoply of rights at risk in the pension context: rights about to be earned but frustrated due to

unlawful employer action, benefits earned but not paid, other rights due a participant but not

fulfilled, and future benefits earned but not yet due.

Vogel v. Independence Fed. Savings Bank, 728 F.Supp. 1210 (D.Md.1990) is a case that

supports the Plaintiff's position.  In *Vogel*, the plaintiff had a stroke and submitted claims under

his employer's medical plan.  Two years later, the employer's insurance plan became more

expensive.  Consequently, the employer, a bank, changed insurance carriers and purchased a new

insurance plan that excluded Vogel from its coverage.  The bank adopted another insurance

policy that again excluded Vogel.  Vogel sued under section 510, and the federal district court

held that the bank's actions precluded summary judgment in its favor.  In *Vogel*, the evidence

suggested that the bank deliberately singled out its employee for exclusion from its insurance policy.

Also, in Vartanian v. Monsanto Co., 880 F. Supp. 63 (D. Mass. 1995), the plaintiffs alleged that the defendant employer falsely told them that the company was not planning any changes in pension benefits, with the purpose of inducing them to retire before the enhanced benefit packages went into effect.  The Vartanian plaintiffs alleged that they would have received the enhanced benefit packages if they had not been "tricked" into retiring early.  The district court said that "[s]ection 1140 reaches a broad range of employer conduct including claims premised on the discriminatory modification of a pension or retirement plan that intentionally benefits or injuries certain identified employees" and ruled that the allegations were enough to state a claim under section 1140. Id. at 71-72.  See also, Heath v. Varity Corp., 71 F.3d 256, 258 (7th Cir. 1995) (***plaintiff terminated just shy of his thirty year vesting date***).  Section 510 shows no distinction between benefits that vest and those that do not.  See Shahid v. Ford Motor Co., 76 F.3d 1404, 1411 (CA6 1996) (holding that §510 draws no distinction between benefits that vest and those that do not); Heath v. Varity Corp., *supra* (same); Seaman v. Arvida Realty Sales, 985 F.2d 543, 546 (CAll) (same), *cert. denied*, 510 U. S. 916 (1993); see also McGann v. H & H Music Co., 946 F.2d 401, 408 (CA5 1991) (implying the same), *cert. denied* sub nom. Greenburg v. H & H Music Co., 506 U. S. 981 (1992); Andes v. Ford Motor Co., 70 F.3d 1332, 1336 (CADC 1995) (implying the same).  See also, *e.g*., Godfrey v. BellSouth Telecommunications, Inc., 89 F.3d 755, 759 (11th Cir. 1996) (ERISA 510 prohibits an employer from threatening to fire a disabled employee in order for the employer to avoid paying further benefits).  And, in Siko v. Kassab, *et al.*, 2000 WL 307247 (E.D. Pa. 2000), this Court held that an ERISA § 510

violation could arise when an employer forces the discharge of an employee because she exercised her right to obtain lawful employee welfare benefits, especially when such discharge also affects that employee's right to obtain future benefits.  See also, <u>Zipf v. AT&T</u>, 799 F.2d 889 (3rd Cir. 1986).  And see, *e.g.*, <u>Le v. Applied Biosystems</u>, 886 F.Supp. 717, 720 (N.D.Cal.1995) (ERISA 510 violation found where plaintiff was fired to avoid payment of medical benefits for his daughter's liver transplant).

To prevail under ERISA § 510 the plaintiff must demonstrate that the defendant had a specific intent to interfere with rights protected by that section.  Specific intent to interfere with rights protected by ERISA § 510 may be shown by direct evidence such as eyewitness testimony or indirectly.  In <u>Hendricks v. Edgewater Steel Co</u>., 898 F.2d 385 (3d Cir. 1990),  for example, specific intent was not shown by terminated employee when employee merely established that plan was funded solely by the employer, that plan provided for 10 year vesting, that he was 11 months short of full vesting when terminated, and that employer was reducing costs.  See also, <u>Dister v. Continental Group, Inc</u>., 859 F.2d 1108 (2d Cir. 1988) (Specific intent was not shown by terminated employee when employee merely established that plan was funded solely by the employer, that plan provided for 10 year vesting, that he was 11 months short of full vesting when terminated, and that employer was reducing costs).

As noted in Reinert's Affidavit, one need not show by direct evidence that LSI was indeed trying to save money since it announced in March 2009 that the pension plan was underfunded, being only at 60% of its funded requirement, representing approximately 238 million dollars in shortages.  In the case at bar, the circumstances can be interpreted clearly: The Defendant did not offer the TLA to Reinert nor the TLA under the transition formula which he

18

became entitled to as a result in the required years of service. Reinert had to make requests and read through the plans to understand what sections might apply.

In the case at bar, however, Reinert was only five days away from full vesting and she has provided evidence that he continued working for LSI after his termination date.  Moreover, had Reinert been simply laid off instead of being "sold" to Infineon, LSI's corporate policy would have given him a sixty day bridge.

> 5.      **Shifting Burdens of Proof**.

It has been held that the presumptions and shifting burdens of proof used in cases brought under Title VII to prove intent indirectly apply in actions brought under ERISA.  This analysis of indirect proof of intent has three stages.  The plaintiff must prove by a preponderance of the evidence a prima facie case of discrimination.  If the plaintiff proves a *prima facie* case, the defendant must articulate some legitimate, nondiscriminatory reason for the employee's rejection.  The explanation must be clear and specific.  Finally, should the defendant meet this burden, the plaintiff is given the chance to prove by a preponderance of the evidence that the legitimate reason offered by the defendant is pretextual.  Kowalski v. L & F Products, 82 F.3d 1283 (3d Cir. 1996).  The employer does not incur liability merely because it makes a poor business decision as to the employee's qualifications in terminating the plaintiff; the issue is whether the employer manufactured a putative business reason to avoid liability.

This analysis is illustrated by the Second Circuit's reasoning in Dister, *supra,* In *Dister,* the Second Circuit concluded that the plaintiff established a *prima facie* case by showing (1) he was in a protected group (i.e. he was an employee who had a chance to obtain rights in an ERISA covered benefit plan), (2) there was abundant evidence that he was qualified for his

position, and (3) that his discharge occurred under circumstances creating an inference of prohibited discrimination (*i.e.* the discharge occurred four months before the plaintiff would have obtained increased benefits if he had remained employed and the employer saved about $550,000 by discharging the plaintiff early).  But in *Dister,* the court concluded that the employer had articulated a legitimate nondiscriminatory reason for terminating the plaintiff, namely that the termination occurred because the employer changed its business priorities and wanted to cut costs.  The Second Circuit also concluded that the plaintiff was unable to show by a preponderance of the evidence that the employer's reason was a pretext and concluded that the employer actually discharged the plaintiff for the nondiscriminatory reasons stated.  The record showed that the plaintiff's duties had been reduced and that on many days he had nothing to do. In the case at bar, however, Reinert was a valued employee who in fact continued to work on the SEMC for LSI after her termination date.

### 6.     Exhaustion of Plan Remedies.

The courts are split on whether plan remedies must be exhausted before an action can be brought under ERISA Section 510.  Compare Zipf , *supra*, with Kross v. Western Electric Co., 701 F.2d 1238 (7th Cir. 1983); and see Mason v. Continental Group, Inc., 763 F.2d 1219 (11th Cir. 1985).  The Eleventh Circuit has held that plan remedies must be exhausted.  The Third Circuit has concluded that although there is no liability under ERISA 510 merely because an employer harbors a discriminatory intent, it is also not necessary that the discriminatory scheme be successful.  It is enough if the employer takes some act to further the discriminatory scheme.  See Gavalik, *supra.*  In such cases a court may award injunctive relief.  Id.

### C.     THERE IS CLEAR EVIDENCE OF DENYING BENEFIT:

There is no doubt that Reinert's early retirement benefit was capable of being reached, based on the circumstances.  She was an employee in good standing.  Her business was reorganized into another several other parts or portions of the company Agere, when divisions were dismantled in the past (Reinert Affidavit ¶7).  Her assumption that the company would not interfere with her right to the early retirement subsidy five days prior to its attainment was supported by a number of statements from her superiors.

What is particularly notable is that the encouragements took place around the time that the company knew, and was engaged in, negotiations with Infineon to sell the business.  While the company obviously could not discuss the engagement they had with Infineon to discuss the sale of the business as early as June, due to antitrust and SEC regulations, the employees of the division were all assured that LSI would continue to honor its benefits plan up to two years after the sale of Agere to LSI.  There is a vice, therefore, in the reasoning that the employer worked to sell a division, while telling employees that their benefits would continue, and subsequently claiming that the benefits were accepted as a consequence of the sale.  As implicated in <u>Bellas</u>, *supra*, selling of a plant is not considered a plan amendment when the buyer assumes the liability of the pension plan, or the buyer has an essentially equivalent plan under which employees would receive the same rights.  There is equal vice in claiming that the employee is not eligible for severance because his job continues, and at the same time denying significant pension benefits on the basis of termination.

Given her years of service in the time frame that the sale was announced, and because she was within one year and five days of her 50th birthday at the time the sale took place, Reinert's benefit was imminent and the ability to attain this benefit was palpable, in the light of the

company's other circumstance and past actions.  There is no argument in this case about the Plan

or the dates, simply about the expectations of the employees based on the past behavior of Agere

in other cases.  Defendant alleges that "Bento denied her request to have his transfer date

negotiated with Infineon so that Plaintiff could remain employed with LSI for additional time

after the closing date to reach her 49th birthday".

The opposite is true.  The contract with Infineon states that the seller will have the ability

to authorize such a change in termination date.  Therefore the Defendant had some discretion in

this regard.  In the past, Agere managers took steps to bring employees to early retirement

eligibility, if they were within weeks or months of achieving their benefit.

This practice, unwritten, was common if there was a means to employ an employee

within the organization.  However, the sale of the business precluded this practice.  In effect, the

sale of the business singles out employees who have good performance that is non-strategic to

the company, from employees who are in a faltering business which the company no longer

wishes to invest in, and who the company will terminate under the force management plan.

There is a logical contradiction in this approach under the company plans, even though they are

clear.

**D.     DEFENDANT OMITTED CRITICAL INFORMATION IN ITS
        ARGUMENT.**

Defendant would like to state unequivocally that all the employees who were in the

division with Reinert's were terminated, along with Reinert's.  However, some crucial facts are

excluded from this argument.  The Plan provides clear definition of what an employee is, and it

specifically excludes common law employees.  Reinert received a W-2 payroll report at the end

of the year.  She received three separate checks from Agere for work performed between

December 2007 and December 2008 (Reinert Affidavit exhibit 17).  Her work was directed by

attorneys hired by Agere, and the work took place between six months and more than a year after

termination.  The checks were subsequently included in a W-2 reporting Reinert's income to the

IRS.  In issuing representations of income under W-2, LSI recognizes that Reinert is not a

common law employee.  In light of these facts, the court cannot apply the standard of review

proposed by the Defendant.  These facts were disclosed in discovery but conveniently ignored by

the Defendant in its Memorandum.

      1.      <u>Effect of the use of Reinert service and subsequent payroll issuance</u>.

Reinert did not sign any releases from LSI upon termination; she did not receive

severance as affirmed by Bento in his testimony, she was not eligible under the severance plan,

in the case of the sale of the business.  In fact, Reinert has affirmed the same, though reserving

the right to claim that the 60 days normally imposed to terminated employees should have

suffced to bridge the pension for the 5 days gap to her transition leave, as was the case for

employees terminated for reasons other than sale of the business.  Reinert contends, based on the

paychecks presented, that the court needs to consider what constitutes an employee on the basis

of other cases, in the context of ERISA, as opposed to other contexts, noting specific intent with

respect to pension situations if applicable.

There is ample discussion of this in <u>Vizcaino v. Microsoft Corp</u>., 120 F.3d 1006 (9th

Cir.1997) (*en banc*).  In *Vizcaino*, the Ninth Circuit held that to interpret the SPP as

distinguishing between common-law employees who were paid through the payroll department

and those who were not would impute to Microsoft an unlawful purpose; namely, to pay some

common-law employees without making the requisite payroll deductions and contributions, the

very tax violation that subsequently engendered the litigation.  The Court held that it should not, if at all possible, favor an interpretation that had such an unlawful effect.  The issuance of payroll checks and corresponding W-2 reported amounts, federal withdrawals, and finally W-2 forms by Agere, must favor the view that Reinert was on the payroll if at all sporadically.  The Defendants will argue that payroll systems did not allow for issuance of other forms of payment.  This argument was utilized in Vizcaino v. Microsoft, and rejected by the court.  The Defendants will argue that the work for the patent was done prior to his termination, and that this benefit was not related to employment.  However, the evidence is contrary.

There would be a weakness, therefore, in the argument that Reinert was not rewarded by Agere for the efforts he provided after October 24, 2007, and the court should therefore favor the view that he was an employee.  This recognition has an effect on the interpretation of the applicability of the Force Management Plan in addition to the early retirement benefit. Additionally, the Pension Plan specifically states that an employee is "any individual who receives a regular and stated Compensation".  Once again, looking to Vizcaino v. Microsoft, supra, if the Reinert's payment for work on the SEMC litigation was simply an award, then one could ask why was it issued on payroll, as certainly it was not Agere's intent to violate the tax code.

The Plan specifically excludes certain individuals from the employee category: (a) an employee who is an active Participant in another Qualified Pension Plan, (b) an employee in a bargaining unit represented by a union, (c)an individual who does not receive payment for services directly from a Participating Company's United States or United States territory payroll even if such individual is reclassified by (etc.)  (d) an individual whose services are rendered

pursuant to a written arrangement which expressly recites that the service provider is not eligible to participate in the plan (e) an employee of an employment agency which is not a Participating Company, (f) ABAs continuously employed since December 31, 1998.

Reinert did not fall into any of these exclusion categories.  Therefore, the payroll treatment favors the employee interpretation of her relationship with Agere.  The claim of Reinert's termination, in light of the payroll checks, is dubious.  Also notable is the context of these paychecks, in that Reinert does not meet any of the excluded employee categories with respect to employee status, and meets the bridging requirements.  In fact the Plan's only exclusion with respect to Payroll is for individuals on non-US payrolls.  The Pension Plan with respect to bridging breaks in service is unambiguous in section 6.4 of the Plan: "(1) any break in the continuity of or absence from the service that does not exceed six (6) months shall be considered as a leave of absence".  Subsequent to a break in service section 6.4 of the Plan states: "the individual's Term of Employment shall be reckoned from the date of such reemployment.", but in this section the Plan also states that less than six months break in service shall be considered a  leave of absence.

Since Reinert's meets the definition of employee, the bridging rules, according to defendant's own plan, apply.

## 2. <u>Congress Intended to Provide Protection in Egregious Situations</u>.

Only the plan itself can create an entitlement to benefits. Consequently, the court is required to enforce the Plan as written unless it can find a provision of ERISA that contains a contrary directive.  The plain language of Employee Retirement Income Security Act of 1974, 29 U.S.C.S. § 1001 *et seq*., reveals that once a benefit is found to be a retirement-type subsidy, it is

considered an accrued benefit.  29 U.S.C.S. § 1054(g).  The protection of retirement benefits

reflects the underlying policy goals of ERISA.  Congress's chief purpose in enacting the statute

was to ensure that workers receive promised pension benefits upon retirement.  See <u>Nachman</u>

<u>Corp. v. Pension Benefit Guaranty Corp.</u>, 446 U.S. 359, 375, 100 S. Ct. 1723, 1733, 64 L. Ed. 2d

354 (1980); see also <u>Smith</u>, 205 F.3d at 604.

     In constructing ERISA, Congress perceived the statute's accrual and vesting provisions as

the heart of that protection.  See <u>Hoover v. Cumberland, Maryland Area Teamsters Pension</u>

<u>Fund</u>, 756 F.2d 977, 985 (3d Cir. 1985).  Accordingly, it recognized that 'Unless an employee's

rights to his accrued pension benefits are non-forfeitable, he has no assurance that he will

ultimately receive a pension.  Thus, pension rights which have slowly been stockpiled over many

years may suddenly be lost if the employee leaves or loses his job prior to retirement.  Quite

apart from the resulting hardships, . . .such losses of pension rights are inequitable, since the

pension contributions previously made on behalf of the employee may have been made in lieu of

additional compensation or some other benefit which he would have received.

     It would appear that if the business needed to be shut down, an exit from the specific

business Reinert was in, her eligibility would be warranted under Agere's FMP plan which

granted her 60 days on payroll after the termination.  In writing ERISA, Congress surely must

not have intended that an employee so close to receiving a benefit that is protected by reaching

her required number years, and then miss the full early retirement monthly benefit by five days

of her birthday.  This is especially audacious when it is acknowledged that she would receive the

benefit in the eventuality that she is laid off through no fault of her own, due to business

conditions.  The distinction of one business condition versus another is suspicious.  It is doubtful

that Congress intended someone who is laid off to receive a higher protected benefit than the same person whose job continues.  In both cases, common sense dictates that the benefit should be achieved.

Congress intended "retirement type subsidy" to mean a subsidy that continues after retirement.  It can be argued that Congress intended the term to include subsidies that begin with early retirement and continue after normal retirement.  A retirement type subsidy has been determined in some cases to be a subsidized early retirement.  For example, in Bellas v. CBS, Inc, *supra*, it was held that where a plan that pays a benefit over and above actuarially reduced normal retirement benefits is a retirement type subsidy, while the portion of the benefit equal to actuarially reduced normal retirement benefits is an early retirement benefit.  In Richardson v. Pension Plan of Bethlehem Steel Corp, 67 F3.d 1462 (9th Cir. 1995), a plan that pays normal retirement benefits at an earlier age is deemed to provide a retirement subsidy, because if the benefits are received at an earlier age, and are not actuarially reduced, the sum of the payments would be greater than if the participant retired at normal retirement age).  See also, Ashenbaugh v. Crucible, Inc. 1975 Salaried Ret. Plan, 854 F.2d1516 (3rd Cir. 1998), holding that an early retirement benefit is a retirement type subsidy if the sum of the monthly payments for the participant's life  exceeds what the participant would have received at normal retirement age. Clearly, comparing the above case law to the case at bar, it can be argued that Congress never intended for early retirement subsidies to be cut in half after 30 years of service.  It would appear that if the business warranted an exit from the specific business Reinert was in, her eligibility would be warranted under Agere's FMP plan which granted her 60 days on payroll after the

termination.  Other employees received such an accommodation under such circumstances, as evidenced in the Fishman case.

### 3.    Other litigation On the Pension Issue is Distinguishable:

Defendant has presented the Court with the May 3, 2010 decision in MUTH v. LSI CORPORATION, Case #: 5:09-cv-01689-JS (U.S.D.C.E.D.Pa.,  Juan R. Sanchez, J.). Defendant argues that the decision in Muth is dispositive because, according to the Defendant, the facts and legal arguments in Muth were identical to those in the case at bar.  This is not the case, as Reinert's situation is completely distinguishable from Muth's situation.  Reinert maintained an extensive and lengthy relationship with Defendant, much more so than the ties which were maintained by Muth.  For example, for the rest of 2007, Reinert worked approximately 6 hours a week on the SEMC litigation for LSI.  All of her work was submitted to LSI directly and no direction or review was provided by Infineon management.  The nature of her work in the SEMC litigation did not change once she transitioned to Infineon.  The work continued to involve participating in teleconferences, reviewing documents, and questions with respect to technical information, people and events surrounding the litigation.  As Reinert began to work for Infineon her responsibilities and desk were in the same location as before for several months.  Reinert continued to work on the SEMC litigation for LSI, performing approximately four hours of work a week from the beginning of 2008 until the end of August 2008, at which time she was laid off from Infineon.  On October 6, 2008, Reinert was contacted by attorneys from LSI requesting that she continue to provide assistance on the SEMC litigation.  The work was the same when she began working on the litigation in 2006; it involved participating in teleconferences, reviewing documents, and questions with respect to technical information,

people and events surrounding the litigation.  On October 15, 2008, Reinert became accepted a

position with the Defendant to work as an independent contractor and was paid $80.00 an hour

for any services she performed for the Defendant or its counsel, Sidley Austin, LLP in

connection with the SEMC lawsuits.  Reinert has received pay from LSI for work on the SEMC

litigation unit as recently as September of 2009.  On December 8, 2008, Pennsylvania

Unemployment determined that Reinert was not self employed with respect to the LSI position

and she was able to receive partial payment of Unemployment Compensation benefits.  From

October through the end of December of 2008, Reinert worked a total of 15.25 hours for LSI on

the SEMC litigation and was paid a total of $1226.87.  In 2009, Reinert continued to work on the

SEMC litigation for the benefit of LSI for a total of 31.75 hours and was paid a total of

$2,540.00.  According to the Defendant's 2007 annual report it states that $12,800,000.00 was

paid out for severance and termination benefits to employees.

## III.   **<u>CONCLUSION</u>**:

Based upon the foregoing arguments and authorities, it is respectfully submitted that the

Defendant's Motion for Summary Judgment should be Denied and Dismissed.

Respectfully submitted,

s/ Donald P. Russo
DONALD P. RUSSO, ESQUIRE
Attorney for Plaintiff
546 Hamilton Street
Allentown, Pa. 18101
(610)776-1840
Attorney I.D. #25873

**CERTIFICATE OF SERVICE**

I, Donald P. Russo, Esquire hereby certify that I served a copy of the foregoing Plaintiff's

Memorandum of Law In Opposition to Defendant's Motion for Summary Judgment,

electronically, via the ECF system, upon the following individual:

Shannon Paliotta, Esq.
Littler Mendelson PC
625 Liberty Avenue, 26th Floor
Pittsburgh, PA 15222

DATE: May 14, 2010                                     s/ Donald P. Russo
                                                              DONALD P. RUSSO, ESQUIRE
                                                              Attorney for Plaintiff
                                                              546 West Hamilton Street, Suite 315
                                                              Allentown, PA 18101
                                                              (610) 776-1840
                                                              Attorney I.D. #25873

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| BRENDA REINERT, | : | |
| | : | No. 09-cv-3097 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LSI CORPORATION | : | |
| | : | JURY TRIAL DEMANDED |
| Defendant. | : | |

## ORDER

AND NOW, this _____ day of _____, 2010, upon consideration of the Defendant's Motion for Summary Judgment, and in consideration of the Plaintiff's Memorandum of Law in Opposition thereto, it is hereby Ordered and Decreed that the Defendant's Motion for Summary Judgment is Denied and Dismissed.

BY THE COURT:

_____
                                                                    J.